PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

DELAINA BARNEY,                        )
                                       )    CASE NO.  5:16CV0112
            Petitioner-Appellant,      )
                                       )    JUDGE BENITA Y. PEARSON
      v.                               )
                                       )
AKRON BOARD OF EDUCATION,              )    **MEMORANDUM OF OPINION**
                                       )    **AND ORDER**
            Respondent-Appellee.       )    [Resolving ECF No. 32]


      Appellant Dalaina Barney ("Parent") filed a Due Process Complaint (ECF No. 1-3)

against Appellee Akron Board of Education (the "Board"), on behalf of her child J.B.

("Student'), under the Individuals with Disabilities Education Act ("IDEA"),  20 U.S.C. §§ 1400-

1482.  At the time of the filing of the Due Process Complaint (ECF No. 1-3), Student was in

third grade and attended Akron Public Schools (the "District").  This case is before the Court on

appeal from a decision of the state level review officer ("SLRO").  The Court has been advised,

having reviewed the record (including ECF Nos. 26 -1, 26 -2, 26 -3, 26 -4, 26 -5, and 26 -6), the

parties' briefs (ECF Nos. 31,[1] 32, and 33), and the applicable law.  For the reasons set forth

below, the Court affirms the SLRO's decision.

---

      [1]  ECF Nos. 31 and 32-1 are the same document.  Appellant filed her brief (ECF
No. 31) under seal.  Therefore, the Board responds to the brief that was emailed by
Appellant to the Board on August 26, 2016.  *See* Electronic Filing Policies and
Procedures Manual (Dec. 1, 2016) at 9 ¶ 19.

## I. Procedural Background

On December 15, 2014, a Due Process Complaint (ECF No. 1-3) was filed by Student's parents, Delaina and Lester Barney.  The complaint was received by the Ohio Department of Education on December 17, 2014 and an impartial hearing officer ("IHO") was assigned.  The factual allegations of the complaint are that Student was denied free and appropriate public education ("FAPE") because:  the District did not provide an adequate individualized education plan ("IEP") or evaluation team report ("ETR") for Student; Student had poor academic success because the IEP was not properly implemented; Student was not educated in the least restrictive environment ("LRE") and was segregated from other students during lunch; the District did not prevent bullying of Student; the District did not provide the services and protections necessary to prevent severe allergic reactions; the District did not provide Student with medicine for his peanut allergy when instructed; and Student was suspended for 10 days without a Manifestation Determination hearing.[2]  Finally, the complaint alleges Parent moved Student to a new school to assuage her fears for his safety.

Parents sought relief in the form of extended school year ("ESY") services, a safe learning environment, peanut allergy protocols for the District, compensatory education, and education in the LRE for Student.

---

[2]  Appellant dropped this issue on appeal to the Court.

The IHO conducted a hearing over several days, and testimony was taken on February 18, 19, 25, and 26, 2015.[3]  At the conclusion of the presentation of evidence, the Board moved for a directed verdict on all issues.  The IHO granted a directed verdict on three (3) issues, finding that Appellant did not prove by a preponderance of the evidence:  that Student's IEP was inadequate, that Student's placement was not the LRE, and that Student was entitled to a Manifestation Determination Hearing.  Petitioners filed a Motion for Reconsideration and a Motion for Sanctions.

On June 11, 2015, the IHO issued her decision concluding that she properly granted the Board's Motion for Directed Verdict, and on the remaining issues, finding that Petitioners did not prove any of their claims by a preponderance of the evidence.

Petitioner-Appellant appealed the decision of the IHO to the SLRO.  After reviewing the record, the SLRO issued a Final Decision and Order on November 9, 2015, affirming the decision of the IHO.  The SLRO found that the IHO was not biased and the Parents received a fair and impartial hearing.

In December 2015, Appellant filed a Notice of Appeal (ECF No. 1-1) seeking review of the SLRO's decision in the Summit County, Ohio Court of Common Pleas, being Case No. CV-2015-12-5779.  Appellee removed the case to this Court on January 19, 2016, on the basis of federal question jurisdiction.  *See* Defendants' Notice of Removal (ECF No. 1) at PageID #: 2, ¶ 3).  Appellee then filed a Motion for Judgment on the Administrative Record (ECF No. 32),

---

[3]  The hearing concluded on March 25, 2015; no testimony was taken on that day.

which is now before the Court.[4]  On appeal, Appellant challenges the adequacy of the 2014 re-evaluation, the adequacy of the 2013-2014 IEP, and the adequacy of the 2014-2015 IEP.  ECF No. 32-1 at PageID #: 1113, 1122.  Appellant alleges the re-evaluation was late and did not consider all the necessary data, the District did not properly address Student's peanut allergy, and Parent was denied an opportunity for meaningful input.  ECF No. 32-1 at PageID #: 1113-18.  Appellant also alleges that the failure to reconvene the IEP team to address bullying, and the failure to consider ESY services are violations of the IDEA.  ECF No. 32-1 at PageID #: 1120-21.  In regards to the IEPs, Appellant argues they were procedurally defective, Student's goals were not appropriate, the IEP teams failed to address Student's transiency, and Student was not educated in the LRE.  ECF No. 32-1 at PageID #: 1122-26.

## II.  IDEA Overview

### A.  Statutory Framework

The purpose of the IDEA is to guarantee children with disabilities access to FAPE.  20 U.S.C. § 1400(d)(1); *See Burilovich v. Bd. of Educ. of Lincoln Consol. Sch.*, 208 F.3d 560, 565 (6th Cir. 2000).  The term FAPE is defined in 20 U.S.C. § 1401(9) as special education and related services that "(A) have been provided at public expense . . . ; (B) meet the standards of the State educational agency; (C) include an appropriate . . . education in the State involved; and

---

[4]  During the Telephonic Status Conference held on March 30, 2016, the Court was informed by counsel that many of the demands set forth in Appellant's Settlement Demand had been resolved.  Order (ECF No. 21) at PageID #: 212.  At that time, only two issues were unresolved.

(5:16CV0112)

(D) are provided in conformity with the individualized education program under [20 U.S.C. § 1414(d)]."

The Sixth Circuit summarized the framework of the IDEA in *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 762-63 (6th Cir. 2001). In exchange for federal funding, the state must identify, locate, and evaluate "[a]ll children with disabilities residing in the State . . . and who are in need of special education and related services. . . . " 20 U.S.C. § 1412(a)(3)(A). *See Knable*, 238 F.3d at 762.

**B. Relief under the IDEA**

Parents who disagree with the appropriateness of an IPE may seek relief under the IDEA. Parents begin by filing a due process complaint with the school district, followed by a due process hearing conducted by an IHO. 20 U.S.C. § 1415(f). Any party aggrieved of the findings may appeal the result of the hearing to an SLRO. 20 U.S.C. § 1415(g). Finally, any party aggrieved by the findings of the SLRO may bring an action in any State court of competent jurisdiction. 20 U.S.C. § 1415(i)(2)(A).

The party requesting a hearing under the IDEA cannot raise any issues that were not raised in the due process compliant, unless the opposing party agrees[5]. 20 U.S.C. § 1415 (f)(3).

---

[5] At the hearing before the IHO and SLRO, the issue of the Board's failure to produce records was raised. This issue was not in the Due Process Complaint (ECF No. 1-3) and was, therefore, improperly before the administrative review officers. ECF No.1-2 at PageID #: 41. Both the IHO and SLRO addressed this issue in their final orders, but as the issue was not properly raised in the due process complaint it is not addressed here. Furthermore, the Court has previously lamented, Appellant's counsel was given the opportunity to review the Board's files but did not take advantage of the opportunity. ECF No. 21 at PageID #: 213.

The due process hearing must be requested within two years of when a "parent or agency knew or should have known about the alleged action that is the basis of the complaint." *Id.*  The only exceptions to the two-year statute of limitations are if there was a misrepresentation by the local agency that the problem had been resolved, or if the agency was withholding information from the parent that was required under 20 U.S.C. § 1415.

### III.  Findings of Fact

Findings of fact and conclusions of law are based on an examination of the record, and any additional evidence submitted to the Court.  Deference is given to the IHO on credibility assessments as the IHO is in the best position to judge the credibility of testifying witnesses. *Maple Heights City Sch. Bd. of Educ. v. A.C., etc.*, No. 1:14CV1033, 2016 WL 3475020, at *5 (June 27, 2016) (Boyko, J.) (citing *B.H. v. W. Clermont Bd. of Educ.*, 788 F. Supp.2d 682, 693 (S.D. Ohio 2011)).

At the time of the due process hearing, Student was eight years old and was enrolled as a third-grader in the Akron Public Schools.  Student suffers from ADHD and a severe peanut allergy.  Tr. 44.[6]  Student was initially enrolled in Akron Public Schools as a preschooler.  Board

---

[6]  The Ohio Department of Education submitted for filing the complete record of the administrative proceedings in this case.  The record is voluminous (contained in a box) and, for that reason, was not be electronically filed.  Due to the private nature of much of the information contained in the record, the Court ordered that the entire administrative record be sealed.  Order (ECF No. 10).

Ex. 6.[7] At the time of the 2013-2014 IEP, Student was enrolled at Leggett. Board Ex. 11, p.3.

On February 24, 2014, Student transferred to Glover, and on September 8, 2014, Student

transferred to Crouse Elementary. Board Ex. 6. Multiple moves can negatively impact a

student's progress under any IEP. Student, in this case, moved schools multiple time. Tr. 75,

135-36, 305, 405-406, 467, 939-40.

### A. 2013-2014 IEP

At the time of the 2013-2014 IEP, Student was in second grade at Leggett. The IEP team

met on November 18, 2013. Board Ex. 11 at 1, 3. Parent was present and participated in the

team meeting. Megan Nye, who was the occupational therapist on the IEP team, drafted the

occupational therapy goal and explained the reasoning behind the goal to Parent. Board Ex. 11 at

2. No one on the team disagreed with the goal. Tr. 130-32. The team determined that ESY

services were not necessary. Board Ex. 11 at 11. It also determined that the LRE for Student

was for him to spend part of his day in the resource room (21 to 60% of his time per week).

Board Ex. 11 at 1.

The IEP set out five goals: Numbers & Operations, Sight Recognition, Written

Comprehension, Listening & Speaking, and School-based therapy. Board Ex. 11 at 4-8. Each

goal had measurable Benchmarks and objectives and required frequent progress reports be given

to the parents. *Id.* The IEP had the date of mastery designated as November 17, 2014. *Id.*

---

[7] The Court appreciates that the Ohio Department of Education provided a copy of the complete record of the administrative proceedings on disk. The electronic version of both the Board of Education Exhibit List binder and Petitioner's Exhibit List binder does not, however, identify either where an exhibit begins or ends.

Parent signed the IEP and did not object to the goals. Board Ex. 11 at 14. The IEP indicated that a copy of the IEP had been given to Parent, along with a copy of the Procedural Safeguards Notice. A copy of the IEP was also sent to Parent on November 19, 2013. *Id.*

### B. 2014 Reevaluation

The ETR determines Student's eligibility for special education and related services, but does not determine what services are to be provided. Tr. 103-104. The data reviewed for the ETR included an updated IQ assessment, academic assessments, updated patient information, data gathered from the intervention specialist, and an evaluation of adaptive behavior. Tr. 30. The school psychologist, Heather Betham, also performed several evaluation tests. Betham has a education specialist degree in school psychology, a bachelor's in education, and a masters in school psychology. Tr. 30.

Student was tested on the Vineland2, which measures adaptive behavior. Student scored in the low range indicating he needed more assistance throughout the school day. Tr. 36. Student was also tested on the Woodcock Johnson III Edition Tests of Achievement, which measures academic skills; the Wechsler's Independent Achievement test, which measures early reading skills; and, the Woodcock Johnson III Edition Tests of Cognitive Abilities, which test general intelligence. Tr. 36-38. Student was also scored in verbal and thinking ability. *Id.*

During the ETR period, Student reported injuring his head during a bicycle accident. All testing, except for the speech evaluation, was completed prior to the reported head injury. Tr. 40, 893. On or about July 21, 2014, Student received a neuro-psychological evaluation at Akron Children's Hospital, as a result of the reported head injury. Petitioner Ex. 4 at 23. The report

states that the "[possible][worsening of attention and behavior] is expected to resolve but [Student] will have ongoing disabilities due to the way his brain developed." *Id.* The evaluator went over the report with the mother for three hours. The mother was unable to explain some of the data in the report, but could understand the language with the evaluator's explanation. Tr. 839-40. As a result of the July 21st evaluation, Student was placed on Ritalin. Tr. 890-91.

Student was assessed by his intervention specialist on the Connors 3-T(S), which gives a quick assessment of hyperactivity and impulsivity. Student's scores were consistent with his diagnosis of ADHD. Tr. 47-48. Student was given academic assessments by his teachers, which were consistent with his level of independent functioning within the academic setting. Tr. 55-56. Math was noted as one of his strengths. Tr. 65. The ETR indicated Student was eligible for an IEP, language therapy, and occupational therapy. Board Ex. 9. The District offers after school reading programs, which are available to all students regardless of disability. Tr. 80. Parent did not register Student for a program because she does not have transportation to get him home at 4:00 p.m. Student has been provided with transportation to school because of his asthma. Tr. 854-55. The ETR states that Student has severe allergies and that an EpiPen is kept at school. Tr. 91-92, Board Ex. 9.

An ETR meeting was held on May 23, 2014 to discuss the results of the evaluation. Board Ex. 9. Parent was present during the planning process and the meeting on May 23rd. Tr. 72. Parent had previously given consent for the reevaluation on March 12, 2014. *Id.* Parent filled out a parent questionnaire that specifically asked about bullying and she did not indicate any concerns. Parent never reported any bullying to the principal at Crouse Elementary. Tr. 88,

930-31. At the end of the evaluation, Parent signed the report and checked the box that indicated she "agree[d]" with the conclusion of the report. Tr. 89; Board. Ex. 9 at 28.

### C. 2014-2015 IEP

Patricia McCluskey is the primary intervention specialist at Crouse Elementary, and has worked there for 19 years. Ms. McCluskey was a member of Student's 2014-2015 IEP team. Tr. 243. Megan Nye, an occupational therapist, and has been employed by the District for 13 years. Ms. Nye was a member of the 2013-2014 IEP team while Student was at Leggett and was also a member of Student's 2014-2015 IEP team at Crouse. Tr. 107, 117, 139-40, Board Ex. 11. Ms. Nye has not been specifically trained in the use of an EpiPen, but she is aware of how to use it. Tr. 114. Theresa Hudson was Student's third grade teacher at Crouse. Mrs. Hudson has been a teacher for 24 years, and has worked at Crouse for 22 years. Mrs. Hudson was also a member of Student's 2014-2015 IEP team. Tr. 340.

The IEP determines day to day instruction and includes accommodations for testing and transportation. Tr. 78, 981. There was an IEP team meeting on November 7, 2014. Ms. McCluskey picked up and dropped off Parent, so she could attend the meeting. Tr. 300. Ms. Nye had collected data throughout the previous year to assist with setting objectives and goals. Ms. Nye also drafted the occupational therapy goal and explained the reasoning to Parent. No one on the team disagreed with the goal. Tr. 130-32. A draft of the proposed IEP was brought to the meeting for the team to discuss, including Student's mother. Tr. 247. A draft of the IEP is often provided to the parents before the meeting to facilitate discussion. Tr. 293. The IEP team

reviewed all goals and supporting data with Parent.  Tr. 295.  Parent was an active participant during the team meeting.  Tr. 300.

The IEP team also determined what related services, if any, would be necessary.  The IEP team determined a van would be provided to take Student to school.  Tr. 981.  ESY services are offered for students who regress over the summer.  Tr. 253.  ESY services are determined at the end of the school year by the IEP team based upon current data.  Tr. 125.  The IEP team discussed ESY services, but determined they should not be offered to Student at that time, as he was progressing in his IEP goals.  Tr. 323-24, 303-304.  Extracurricular activities at the school are offered to all students regardless of their disability, and were similarly available to Student. Tr. 1090-91.

The staff at Crouse did not report any behavior issues with Student.  Tr. 301, 384-85; Board Ex. 8.  This was a change from the behavior reported on the ETR and after Student was prescribed Ritalin.  Tr. 385-86.  Parent did not ask for any accommodations at the 2014-2015 IEP meeting.  Tr. 884-885.  Parent received a copy of "Whose Idea is This, a Guide for Parents" at the IEP meeting.  Tr. 882.  Parent signed the IEP in the box that indicated "I agree with the implementation of this IEP," and not the box "I am signing to show attendance, but do not agree with the Special Ed and related services specified."  Tr. 880-81; Board Ex. 7 at 195.

Student made progress on his IEP goals during his time at Crouse.  Tr. 349-50.  When Student first started at Crouse, Student knew about 10 basic vocabulary words.  Tr. 298.  By the time Student left, he had mastered 16 to 20 words.  Tr. 299.  Student had also advanced from a "B" reading level to a "C" level and was trying to progress to a "D" level.  Tr. 377.

Prior to the filing of the Due Process Complaint (ECF No. 1-3), no complaints or concerns were expressed by Parent regarding the implementation of the IEP or the need for additional services. Tr. 941.

### D. Peanut Allergy

As earlier stated, Student has a severe peanut allergy. Tr. 44. Prior to September 30, 2014, Student had one allergic reaction at school, that occurred while he was in pre-school. Tr. 877. Student is knowledgeable about his allergy and has an Allergy Action Plan (the "Plan") prepared by Akron Children's Hospital. Tr. 98; Board Ex. 3 at 1. Student does not have a 504 Plan under the Rehabilitation Act of 1973. Tr. 258. A copy of the Plan was provided to Student's teacher and she put it on her bulletin board. Tr. 360-61. The principal also gave the staff a list of names of children with allergies. Tr. 924.

The school's policy is to send the child to the health aide if the child appears to be having an allergic reaction. Tr. 947-48. The school health aide, Elizabeth Reed, is an employee of Akron Children's Hospital and is a state registered nurse's aide. Tr. 1002,1021. The school also employs a school nurse, who provides nursing services for special needs students. Tr. 1074-75.

Student was not the only student in the third-grade class with a peanut allergy. Tr. 206. A sign indicating a peanut allergy was placed inside Student's classroom, as well as in the intervention specialist room. Tr. 261, 359, 1007-1008. The intervention specialist also has a posting in her room providing information about what to do in emergency situations, including anaphylactic shock. Tr. 290-91. Signs were also placed outside other classrooms that had

students with peanut allergies. Tr. 262, 1008. All of the third grade classrooms were adjacent to each other in the same hallway on the second floor. Petitioner's Ex. 9.

Parents are required to provide to the school any medication their child needs. The school cannot provide medication without a parent completing the necessary forms and providing the medication. Tr. 460-61, Board Ex. 12. Parent provided an EpiPen, Ritalin and an inhaler to the school. Tr. 91-92, 1003. Ms. Reed tried to reach out to Parent several times to have her bring Benadryl, as the EpiPen is only used if the child is experiencing a life-threatening injury. Tr. 579, 1004. The EpiPen was stored in a locked cabinet. Tr. 1032, 1088. The principal, health aide, and food service aide are all trained to use an EpiPen. Tr. 953-54, 957. Student's Plan does not require a medical opinion or specialized training. Tr. 580.

In 2012, Parent submitted a letter from Dr. Rajeev Kishore to one of the schools Student attended. The letter contained a list of recommendations for the school on becoming nut free. Board Ex. 3 at 5. The District made its best efforts to implement the precautions. Tr. 967. The director of special education, however, called Dr. Kishore because she was concerned the recommendation that allergy medications not be locked up was a violation of Ohio law. Tr. 1092. The director understood this to be a letter with recommendations only that was sent to all of Dr. Kishore's patients. *Id.* Dr. William Smucker reviewed the recommendations and indicated he would not be against them, but he didn't know how plausible they would be. Tr. 559, 565, 567.

Crouse provides its students with a free breakfast and lunch program of which almost all of the students partake. The third graders, such as Student, are served breakfast in their

13

classrooms, and a breakfast cart comes to their hallways.  Tr. 262-63, 266-67.  No other food is allowed in the classroom and Student eats lunch in the cafeteria.  Tr. 354.  No one in Mrs. Hudson's class packs their own lunch.  Tr. 375.  Student eats lunch with several friends who do not eat peanuts, and the table is wiped off and cleaned before Student gets his lunch.  Tr. 682, 925.

Crouse serves the same items every weekday.  On Tuesdays, the school serves bagels for breakfast.  The menu is bagel, cream cheese, peanut butter, margarine, jelly, fruit, and milk.  Tr. 271-356.  The peanut butter is in individually sealed containers.  *Id.*  When Student was at Crouse, the principal instructed the food servers that peanut butter containers should not be sent to the second floor.  Tr. 925.  Each student picks what they want from the breakfast cart and then takes it back to their classroom to eat.  Breakfast is served between 8:00 a.m. and 8:30 a.m.  Tr. 357.  After breakfast, the teachers wipe down the classroom tables.  Tr. 925.

### E.  September 30, 2014

On Tuesday, September 30th, the breakfast cart was sent to Student's hallway with the peanut butter containers.  Tr. 397.  Upon discovering the error, Ms. McCluskey, the intervention specialist, called Parent to ask if it would be alright for Student to eat breakfast in Ms. McCluskey's office that morning.  Tr. 275.  After Ms. McCluskey was unable to get in touch with Parent, she called Student's grandfather, who agreed Student should eat with Ms. McCluskey in her office.  Tr. 273, 309.  After breakfast, while Student went to his first class of the day, the third grade teachers cleaned their rooms with Clorox wipes.  Tr. 273-75, 365-66.

Later in the day, Student's mother called Mrs. Hudson to check on Student.  Tr. 373-74, 388.  Mrs. Hudson told Student's mother that she observed a small red dot under Student's eye. Tr. 374.  Mrs. Hudson observed no signs of facial swelling, but sent Student to Ms. Reed's office as any rash had to be reported.  Tr. 374, 419.  Student's mother said she would come by the school after a doctor's appointment to check on Student.

Student went to Ms. Reed's office around 11:00 a.m. to get his daily dose of Ritalin. While he was there, Ms. Reed observed the small red dot.  Tr. 1010,1039.  The dot was not raised and Ms. Reed concluded it was not an allergic reaction.  Tr. 1047.  Student was not exhibiting any symptoms of an allergic reaction and appeared totally normal.  Tr. 1009-1010, 1047-48.

Student's mother arrived at the school around 11:30 a.m. and asked for Student to be brought to Ms. Reed's office.  Tr. 1011.  When Student arrived, his mother gave him a dose of some liquid that was in her purse.  Tr. 1013.  Student's mother asked Ms. Reed to administer the EpiPen to Student.  Ms. Reed declined and explained the EpiPen should only be used in life-threatening situations.  Tr. 1055, 1064.  Ms. Reed disagreed with Parent that anything was wrong with Student.  Student's mother then asked the secretary in the next office to call 9-1-1.  Tr. 1014.  Student's mother did not disclose what liquid she had given to Student, she did not ask Ms. Reed to give her the EpiPen, she did not administer the EpiPen herself, and she did not call 9-1-1 herself.  Tr. 970, 1046, 1056.

The Principal, Mrs. Harper-Brooks, who had a good relationship with Student's mother, came to Ms. Reed's office.  Tr .931.  The Principal did not believe that 9-1-1 needed to be called,

but when Student's mother said she wanted to go to the hospital, Mrs. Harper-Brooks offered to drive her there. Tr. 934. Mrs. Harper-Brooks drove Student and his mother to the emergency room at Akron Children's Hospital, where Student's father met them. Tr. 823, 936. The Principal left without entering the building. Tr. 823. Student did not return to school until Monday, October 6, 2014. Board Ex. 21. Parent brought a note from a nurse practitioner that stated "[Student] was seen in my office on 10/1/2014 at 2:30 PM." Under the typed statement was a handwritten note that said "Pt to be out till Mon Oct.6." Board Ex. 21. Dr. Smucker reviewed the note and opined it was unclear why the nurse practitioner would recommend that Student not return to school until October 6th. Tr. 575. When Student returned to school on October 6, 2014, Student's mother also brought some Benadryl and additional Ritalin pills to keep in the clinic. Tr. 782, 1016.

On November 7, 2014, Student was removed from Crouse. Tr. 1018. Student moved to Leggett on November 10, 2014. When McCluskey found out, she contacted the intervention specialist at Leggett to discuss Student. Tr. 292.

### IV. Standard of Review

Parent alleged in her Due Process Complaint (ECF No. 1-3) that Student was denied FAPE by the District for a multitude of reasons discussed below. As the mother is the party challenging the provision of FAPE, she has the burden of proving by a preponderance of the evidence that the Board did not comply with the requirements of the IDEA. *See Schaffer ex rel. Schaeffer v. Weast*, 546 U.S. 49, 51 (2005).

16

In an IDEA action, the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).

The Supreme Court has given a two part test for courts to use when reviewing an IDEA claim. "First, has the State complied with the procedures set forth in the [IDEA]? And second, is the [IEP] developed through the [IDEA's] procedures reasonably calculated to enable the child to receive educational benefits?" *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206-207 (1982) (footnotes omitted). The Court must strictly review the IEP process for procedural compliance, but a mere technical deviation will not necessarily invalidate the IEP. *Dong ex rel. Dong v. Bd. of Educ. of Rochester Cmty. Sch.*, 197 F.3d 793, 800 (6th Cir. 1999). A school district's determinations are given greater deference when the procedural requirements of the IDEA are met. *Dong*, 197 F.3d at 800 (citing *Tucker ex rel. Tucker v. Calloway Cnty. Bd. of Educ.*, 136 F.3d 495, 502 (6th Cir. 1998).

When reviewing substantive violations, the Supreme Court has held a reviewing court should make an "independent decision[ ] based on a preponderance of the evidence." *Rowley*, 458 U.S. at 205 (quoting S. REP. No. 94-455, at 50 (1975) (Conf. Rep.)). However, courts should not "substitute their own notions of sound education policy for those of the school authorities which they review," instead the courts must give the administrative findings their due weight. *Rowley*, 458 U.S. at 206. Administrative findings are given more weight "on matters for which educational expertise is relevant." *McLaughlin v. Holt Pub. Sch. Bd. of Educ.*, 320 F.3d

(5:16CV0112)

663, 669 (6th Cir. 2003) (citing *Burilovich*, 208 F.3d at 567).  The district court will review the

administrative findings under a "'modified' *de novo*" standard, where the district court "is

required to make findings of fact based on a preponderance of the evidence contained in the

complete record, while giving some deference to the fact findings of the administrative

proceedings." *Knable*, 238 F.3d at 764 (citing *Tucker*, 136 F.3d at 503).

## V.  Discussion

### A.  Additional Evidence

The Sixth Circuit has taken the expansive view that additional evidence may be added to

the administrative record, as long as it "is necessary for consideration of whether the original IEP

was reasonably calculated to afford some educational benefit." *Deal v. Hamilton Cty. Bd. of

Educ.*, 392 F.3d 840, 850 (6th Cir. 2004) (citing *Metro. Bd. of Public Educ., Metro. Gov't v.

Guest ex rel. Guest*, 193 F.3d 457, 463 (6th Cir. 1999)).  "The determination of what

is 'additional' evidence must be left to the discretion of the trial court." *Metro. Gov't of Nashville

and Davidson Cty, Tenn. v. Cook*, 915 F.2d 232, 234-35 (6th Cir. 1990) (quoting *Town of

Burlington v. Dep't of Educ. for Com. of Mass.*, 736 F.2d 773, 791 (1st Cir. 1984)).  Appellant

submitted a Motion to Supplement or Add Evidence to the Administrative Record (ECF No. 26).

The Board did not oppose the motion.  On March 9, 2017, the Court granted the motion in part,

allowing Appellant to add six exhibits to the record (ECF Nos. 26-1, 26-2, 26-3, 26-4, 26-5, and

26-6).  Order (ECF No. 35) at PageID #: 1191.

**B. Alleged Violations of the IDEA**

**1. The reevaluation was adequate and considered the necessary information**

The District's reevaluation of Student was not delayed, and considered all of the information that was necessary to properly evaluate the needs of Student. The Board is required to reevaluate a child at least every three years and not more than once a year, unless the parents agree to the reevaluation. 20 U.S.C. § 1414(a)(2). Student was reevaluated in 2014 per the statutory guidelines, and with Parent's permission. Board Ex. 9; Tr. 72. The local agency must obtain informed consent from the parent before conducting any reevaluation of Student. 20 U.S.C. § 1414(c)(3). Parent did not give her permission until March 12, 2014. Tr. 72.

When conducting a reevaluation, the IEP team will review existing data about the student including: state or local classroom-based assessments, evaluations by teachers, and any outside evaluations or information provided by the parent of the child. 20 U.S.C. § 1414(c)(1). From the data the IEP team will determine: whether or not the child continues to qualify for disability services, what the child's current level of academic achievement is, and what related services, if any, should be provided to the child. 20 U.S.C. § 1414(c)(1)(B). If the IEP team is unable to determine the goals in paragraph (1)(B), then the local education agency will "administer such assessments and other evaluation measures as may be needed to produce the data identified by the IEP Team under paragraph (1)(B)." 20 U.S.C. § 1414(c)(2).

The District used a variety of technically sound instruments to make an accurate assessment of Student. 20 U.S.C. § 1414(b); Tr. 36-38, 55-56. The IEP team was able to determine that Student did continue to qualify for special education services, Student's current

level of academic achievement, and what related services should be provided to Student. The ETR determined Student was eligible for an IEP, language therapy, and occupational therapy. Board Ex. 9. The IEP team was also able to determine Student's current level of academic achievement and set appropriate goals that Student made progress on. Tr. 55-56, 65, 298, 299, 349-50, 377. The IEP team discussed related services such as ESY, and determined it should not be offered to Student at the time. Tr. 323-24, 303-04.

Parent was present during the planning of the evaluation. Tr. 72. Parent also filled out a questionnaire as part of the evaluation. Tr. 88. The ETR was conducted and an ETR team meeting was held on May 23, 2014 to discuss the results of the evaluation. Board Ex. 9. Parent did not raise any objections until the filing of the Due Process Complaint (ECF No. 1-3). Board Ex. 11 at 14; Board Ex. 7.

## 2. The IEP was appropriate and properly implemented

Appellant alleges that the IEP developed by the District is not appropriate. However, at each stage of the present litigation, Appellant alleges different reasons for the inadequacy of the IEP. In the Due Process Complaint, Appellant merely alleges the IEP is inadequate and was not properly implemented. ECF No. 1-3 at PageID #: 51-53. In Appellant's brief to the IHO, she alleges the IEP was not properly implemented because Student did not receive individualized instruction in all areas, and Student was not provided with the necessary accommodations, such as a wiggle seat, multiplication chart, and modified homework. ECF No. 1-4 at PageID #: 81. In Appellant's appeal to the Court, she alleges that the IEP was inadequate because it was defective on its face, the goals were not being met, it did not address Student's transiency, and Student was

not in the LRE.  ECF No. 32-1 at PageID #: 1122-27.  As the Court has previously stated

Appellant's counsel "appear to want to move the target by lodging new allegations and claims,

without appropriate factual, statutory, or case law support."  ECF No. 21 at PageID #: 215.

Accordingly, the Court has analyzed the IEP for procedural compliance, and for a determination

of "whether the student's substantive rights to services under the IDEA were violated."  *N.L. ex*

*rel. Ms. C. v. Knox Cty Sch.*, 315 F.3d 688, 693 (6th Cir. 2003) (referencing the two-part IDEA

review developed by the Supreme Court in *Rowley*, 458 U.S. at 206-207).

### a. Procedural Compliance

The SLRO and IHO properly found that the District created an appropriate IEP for

Student, and the IEP was properly implemented.  Appellant did not meet her burden to show that

the IEP was inadequate or did not properly address Student's needs.  The first part of the *Rowley*

test is:  did the school district comply with the "procedures set forth in the [IDEA]?"  *Rowley,*

*458 U.S. at 206-207*.  The Sixth Circuit has held that the party challenging the adequacy of an

IEP should bear the burden of proving that the IEP established by the school district was

inappropriate.  *Cordrey v. Euckert*, 917 F.2d 1460, 1469 (6th Cir. 1990).  An IEP is prepared by a

child's "IEP team," which consists of teachers and school officials working in collaboration with

the child's parents.  20 U.S.C. § 1414(d)(1)(B).  The IEP must comply with the procedures in 20

U.S.C. § 1414(d)(1)(A).

Congress has stated an IEP must consist of "statement[s] of the child's present levels of

academic achievement," annual goals that "enable the child to be involved in and make progress

in the general education curriculum," a description of how the goals will be measured and when

progress reports on the child will be given, a statement of any related services that will be provided for the child, and an explanation, if needed, of why the child is not participating in regular class and activities.  20 U.S.C. § 1414(d)(1)(A).  The IDEA requires the school district review the IEP annually to determine whether the child is meeting annual goals.  20 U.S.C. § 1414(d)(4)(A)(i).  Finally, the IDEA requires that children with disabilities be educated with non-disabled children "[t]o the maximum extent appropriate."  20 U.S.C. § 1412(a)(5).

The District is required to provide the parents of a child with disabilities a copy of the procedural safeguards available to them under the IDEA, at least once a year.  20 U.S.C. 1415(d)(1)(A).  The District provided Parent with a copy of the procedural safeguards at both IEP meetings.  Tr. 882; Board Ex. 11 at 14.

In addition, Parent had meaningful opportunity for input.  The District must afford the parents of a student with disabilities meaningful opportunity to participate in the development of the IEP.  *See* 20 U.S.C. § 1414(b)(4).  The District may not unilaterally create an IEP for a child with disabilities, without considering concerns of the parents.  Predetermination is a violation of the IDEA.  *Deal*, 392 F.3d at 857.  However, the IEP team may come prepared to the meetings and have pre-formed opinions.  *Nack ex rel. Nack v. Orange City Sch. Dist.*, 454 F.3d 604, 610-11(6th Cir. 2006).  Preparation is not synonymous with predetermination.  *Deal*, 392 F.3d at 857.  The District is not required to take parents' suggestions, but the District must show that the parents had an opportunity to participate and their suggestions were seriously considered.  *Nack*, 454 F.3d. at 610 (citing *Knox Cty. Sch.*, 315 F.3d at 694).

Parent was present at the IEP meetings.  Tr. 300; Board Ex 11, p.2.  The IEP team took time to explain the goals and the reasoning for the goals to Parent.  Tr. 295.  The IEP team discussed special education and related services during the IEP team meetings, and allowed the Parent to voice suggestions.  Tr. 323-24, 303-04.  The IEP team did not predetermine the IEP for Student without considering the mother's input.

The District is required to provide an IEP for each child with a disability in the agency's jurisdiction.  20 U.S.C. § 1414(d)(2)(A).  The District provided Student with an IEP at the beginning of both the 2013-2014 school year and the 2014-2015 school year.  Board Ex. 11 at 1, 3; Tr. 300.  The IEP teams ensured that the assessments used to design Student's IEP were valid and reliable and were administered by trained personnel.  Tr. 30, 107, 117, 139-40, 243, 340.  The IEP teams addressed the child's needs in all areas of suspected disability and coordinated efforts between Student's schools to ensure Student was fully evaluated.  Tr. 30, 130-32, 292.  The IEP team properly considered the necessary factors according to 20 U.S.C. § 1414(b)(3), and Parent had meaningful participation in the IEP meetings.  Board Ex. 11 at 2; Tr. 300.

Upon examination of the record, the IEP developed by the school district complied with the requirements under 20 U.S.C. § 1414(d)(1)(A).  The IEP properly addressed Student's current academic achievement, contained measurable goals specifically designed to meet Student's needs, described how the annual goals were to be met, and explained why and for how long Student would not be participating in regular class with non-disabled children.  Tr. 298-99, 303-304, 323-24, 377.  Parent signed both of the IEP forms and did not raise any objections until the filing of the Due Process Complaint (ECF No. 1-3).  Board Ex. 11 at 14; Board Ex. 7.

**b. Substantive Review**

The second prong of the *Rowley* test is, whether the IEP "developed through the [IDEA's] procedures [is] reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207. The IDEA requires that a student be able to "benefit" from the instruction provided. The Supreme Court has held that access to an "equal" educational opportunity does not mean that a school district must provide "every special service necessary to maximize each handicapped child's potential." *Id.* at 189, 199. In a recent decision, the Supreme Court revised the *Rowley* standard for what qualifies as an educational benefit. In *Endrew F. v. Douglas Cty Sch. Dist. RE-1*, 137 S.Ct. 988 (2017), the Supreme Court held an IEP would be judged as appropriate based on the individual child's potential. *Id.* at 999. An appropriate IEP does not mean that the child must achieve grade-level advancement, but the program "must be appropriately ambitious in light of [the child's] circumstances." *Id.* at 1000.

Based upon the record provided, Student was benefitting from individualized instruction, and had made measurable progress towards annual goals. Tr. 298-99, 377. The advancement made does not have to be equal to that of non-disabled children. Student was advancing based on his potential as determined by the ETR. Board Ex. 9. Student's IEP was proper based on the results of the numerous assessments. Tr. 36, 55-56, 130-32, 295, 349-50. Both the 2013-2014 and 2014-2015 IEPs were being properly implemented by the District. However, any child's progress would be disrupted by multiple moves and Student moved multiple times. Tr. 75, 135-36, 305, 405-06, 467, 939-40.

The Supreme Court also held that when a court is reviewing an IEP, the Court should give deference to the judgment of the school authorities. *Id.* at 1001-1002. Both the SLRO and IHO determined that the IEP was appropriate, and was properly implemented. The record supports the findings of the SLRO and IHO on the appropriateness of Student's IEP. Deference will be given to the SLRO's and IHO's findings because the determination of an appropriate IEP relies on the application of the their education expertise. Ohio Rev. Code § 3323.05(G)(1)(c) ("A hearing officer shall possess knowledge of, and the ability to understand, the provision of the [IDEA] . . . and legal interpretations of that act by federal and state courts.").

### 3. The IEP sufficiently addressed Student's safety

Parent contests the IEP, alleging that it did not sufficiently address Student's safety in regards to his peanut allergy. The SLRO and IHO properly found that the school district took the necessary precautions to avoid a possible allergic reaction. Appellant did not prove that Student suffered an allergic reaction during the time period involved in this action. Furthermore, there is no legal requirement under the IDEA that Student's Action Plan or the other safety measures be fully incorporated into the IEP. The only requirement is that the IEP team give a description of the options considered, and that the IEP team state the reasons those options were rejected. 20 U.S.C. § 1415(c).

Some students with peanut allergies may be eligible to receive special education services under the IDEA. 20 U.S.C. § 1401(3)(A) (students with allergies can qualify as a "child with a disability" under "other health impairments"). However, Student is not eligible for special education services because he has a peanut allergy. It was important for the IEP team to note that

Student had a peanut allergy, but it was unrelated to the reason Student was receiving special education services. Moreover, as the District had other procedures in place to protect students from allergic reactions, there was no procedural or substantive violation of the IDEA that resulted in a denial of FAPE. Tr. 261, 262, 290-91, 359, 924-25, 1002, 1007-1008, 1021.

Parent complained that not all of the IEP team members were knowledgeable about all areas of the IEP. This is not a necessary requirement under the IDEA. 20 U.S.C. § 1414(d)(1)(C) ("A member of the IEP Team shall not be required to attend an IEP meeting . . . [if] the attendance of such member is not necessary because the member's area of the curriculum or related services is not being modified or discussed.").

### 4. Student was educated in the LRE

The Act requires that disabled children be educated with their non-disabled peers to the "maximum extent appropriate." 20 U.S.C. § 1412(a)(5). Courts should not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Doe ex rel. Doe v. Bd. of Educ. of Tullahoma City Sch.*, 9 F.3d 455, 458 (6th Cir. 1993) (quoting *Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 624 (6th Cir. 1990), *superseded in part on other grounds by regulation as recognized in*, *N.W. ex rel. J.W. v. Boone Cnty. Bd. of Educ.*, 763 F.3d 611, 617 (6th Cir. 2014)). More weight should be given to administrative findings "on matters for which educational expertise is relevant." *McLaughlin v. Holt Pub. Sch. Bd. of Educ.*, 320 F.3d 663, 669 (6th Cir. 2003).

The Sixth Circuit has supplied an LRE analysis in *Roncker ex rel. Roncker v. Walter*, 700 F.2d 1058, 1063 (1983). However, the case at bar differs from *Roncker*, in two ways. First, the

analysis in *Roncker* involves a child who was placed in a school where he would have no contact with his non-handicapped peers. *Id.* at 1061. Unlike in *Roncker*, the District did not remove Student from one school to another segregated school. Rather, the District developed an IEP that would allow Student to spend between 40-80% of his time with his non-handicapped peers. Board Ex. 11. Second, the analysis in *Roncker* discusses when it is appropriate to "mainstream" a child. *Id.* at 1063. While, both cases involve an analysis of the same provision of the IDEA, the *Roncker* analysis of mainstreaming is not applicable to the current situation. Student was not sent to a handicap-only school, and Student was not asked to leave any of his schools. Parent did elect to remove Student from the District at various times, but it was not at the recommendation of the IEP teams.

Following the Sixth Circuits holding in *Roncker*, "due weight" should be given to the SLRO and IHO regarding decisions of what qualifies as an appropriate LRE for Student, based on his ETR and disabilities. *Id.* at 1062; *see Burilovich*, 208 F.3d at 567. The decision of the SLRO and IHO should be given greater weight for determining an LRE. Both the SLRO and IHO possess education expertise to determine what qualifies as an appropriate LRE, and their education expertise is relevant to the decision. *Burilovich*, 208 F.3d at 567 ("[S]tate and local educational agencies are deemed to possess expertise in education policy and practice."). Hearing officers' possess special knowledge about the provisions of the IDEA, as well as federal and state interpretations of the Act. Ohio Rev. Code § 3323.05(G)(1)(c). Both the SLRO and IHO found Student was educated in the LRE and that Appellant failed to meet her burden of

proof to show that the Board had improperly segregated Student.  ECF No.1-2 at PageID #: 46;

ECF No. 1-4 at PageID #: 79-80.

The Court agrees that Student was not impermissibly segregated from his non-disabled

peers.  Student spent most of the day with his non-disabled peers.  Board Ex. 11.  Student was

only asked to eat breakfast with the intervention specialist on one occasion when there was a fear

that Student would have an allergic reaction.  Tr. 275, 397.  Before removing Student from the

classroom, the intervention specialist obtained permission from Student's grandfather.  Tr. 273,

309.  Student also eats lunch in the cafeteria with his peers, where proper precautions are taken to

make sure Student will not have an allergic reaction.  Tr. 682, 925.

### 5. Bullying

In the Due Process Complaint (ECF No. 1-3), Appellant alleged that the District failed to

protect Student from bullying.  However, the record shows that Parent never raised the issue of

bullying with the school.  Tr. 88, 930-31.  Parent has failed to prove Student was the victim of

bullying.  Rather, the record shows that Student was a bully while in first grade at Voris.  Both

the SLRO and IHO did not find the mother's testimony credible in regards to this issue.  ECF No.

1-2 at PageID #: 36.  The Court should defer to the IHO on credibility assessments, as they are

best situated to make those determinations.  *Maple Heights*, 2016 WL 3475020, at *5.  Appellant

has failed to meet the burden of proof to show that the District knew Student was a victim of

bullying and did not properly address the issue through the IEP or ETR.

### 6. ESY services

A school must only provide ESY services if the IEP team determines that such services are necessary. *Bd. of Educ. of Fayette Cty., Ky. v. L.M.*, 478 F.3d 307, 314-15 (6th Cir. 2007). The burden is on the appellant to show that ESY services are "necessary to avoid regression so severe that the child would not be able to catch up during the following school year." *Id.* at 315 (citing *Cordrey v. Euckert*, 917 F.2d 1460, 1473 (6th Cir. 1990)). The proponent of ESY services may show that ESY services are necessary through the use of data or expert testimony. *Kenton Cty. Sch. Dist. v. Hunt*, 384 F.3d 269, 279 (6th Cir. 2004). Appellant has not shown that ESY services would have been necessary for Student to avoid severe regression. Appellant has failed to show that Student was experiencing regression or that ESY services were necessary for Student to benefit under his IEP. Student was making progress on his annual goals, not regressing. Tr. 377. The IEP team discussed ESY services and determined they were not necessary at the time. Tr. 323-24, 303-304.

### C. Denial of FAPE

The Board did not violate any of the procedural safeguards of the IDEA, and the IEP developed by the school was reasonably calculated to confer an educational benefit. The District provided an appropriate education that meets the standards set forth by the state agency, and the District provided an IEP in accordance with the guidelines under 20 U.S.C. § 1414(d). 20 U.S.C. § 1401(9). Therefore, Student was not denied FAPE.

(5:16CV0112)

## VI.  Conclusion

For the reasons set forth above and those that have been articulated in the memorandum

of points and authorities on which Appellee relies, Appellee's Motion for Judgment on the

Administrative Record (ECF No. 32) is granted, and the Court affirms the determinations of the

SLRO and IHO regarding the lack of substantive and procedural violations of the IDEA.


IT IS SO ORDERED.


 September 22, 2017                        */s/ Benita Y. Pearson*
Date                                      Benita Y. Pearson
                                          United States District Judge